**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| ALLIANCE RADIOLOGY, P.A.,<br>individually and on behalf of all<br>others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONTINENTAL CASUALTY COMPANY<br><br>Defendant. | Case No. 2:20-cv-02218-JAR-GEB<br><br>COMPLAINT<br><br>Class Action<br><br>DEMAND FOR JURY TRIAL |

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Alliance Radiology, P.A. ("Plaintiff"), individually and on behalf of all others similarly situated, for its First Amended Class Action Complaint against Defendant Continental Casualty Company ("Defendant"), states and alleges as follows:

**NATURE OF ACTION**

1.      According to information published by the Insurance Information Institute, the U.S. insurance industry collected net premiums of $1.22 trillion in 2018.  Premiums recorded by property/casualty insurers accounted for 51% of that amount.  Between 2014 and 2018, these insurers wrote net premiums each year of between $497 billion to $612.6 billion but only incurred losses of between $277.7 billion and $360.9 billion.

2.      Plaintiff is a radiology practice founded in 1998 with twenty-eight physicians reading radiology studies (x-rays, CT scans, MRI, etc…) for approximately twenty hospitals as well as several freestanding imaging centers located in the Kansas City, Missouri metropolitan area. The vast majority of the radiology studies reviewed by Plaintiff's physicians are reviewed from radiology reading rooms at St. Joseph Hospital (Kansas City, Missouri), Liberty Hospital (Liberty, Missouri) and Advent Health Shawnee Mission (formerly Shawnee Mission Medical

Center in Overland Park, Kansas).  Plaintiff is a professional association organized under the laws of the State of Kansas and registered to do business in both Kansas and Missouri.

3.      As a result of COVID-19, state and local Stay at Home Orders (as defined below), recommendations from state and federal agencies such as the Centers for Medicare and Medicare Services (CMS), a federal agency within the U.S. Dept. of Health & Human Services, the Kansas Board of Healing Arts, and the Missouri Board of Registration for the Healing Arts, as well as recommendations from licensing and credential-issuing bodies such as the American Medical Association and the American College of Radiologists, Plaintiff, and the physicians they support, has been forced to stop all elective procedures and greatly reduce its operations.

4.      Plaintiff purchased an all-risk commercial property insurance policy from Defendant to protect it in the event of property loss and business interruption. COVID-19 and the resulting response by state and local governments have caused physical loss of Plaintiff's property and have interrupted Plaintiff's business. Yet, as of this date Defendant has refused to honor its promise to provide the all-risk protection that Plaintiff purchased. Moreover, Plaintiff is not unique. The insurance industry appears to be taking a uniform approach to the current pandemic: deny coverage even when the policy they drafted and offered to insureds, and the policy paid for by the insureds, does not contain an exclusion for pandemic- or virus-related losses. Plaintiff's policy with Defendant is one such policy and exemplifies the broken promise from insurance companies across the country.

5.      This is a class action for declaratory judgment arising from Defendant's refusal to pay claims related to COVID-19 as required by its property insurance agreements it sold to Plaintiff and other businesses.

6.      The novel coronavirus – named "severe acute respiratory syndrome coronavirus 2" or "SARS-CoV2" – has spread widely and rapidly across the United States. The illness related to SARS-CoV-2 is "novel coronavirus disease 2019," commonly abbreviated to "COVID-19." Although the virus and related illness are distinct, for purposes of this Complaint, Plaintiff refers to both interchangeably as "COVID-19."

7.      Over 55,000 Americans have died of COVID-19 as of the date of this filing, according to the CDC.

8.      A growing body of evidence suggests that the virus transmits both through droplets, when someone sneezes and coughs, and aerosols, which are produced by normal breathing.

9.      Aerosols are particularly concerning because unlike droplets, which are suspended only for a few seconds, aerosols are water droplets suspended in air and can remain suspended for hours, until gravity ultimately forces them to the nearest surface below.

10.     Consequently, aerosols can spread widely through air flow and settle on surfaces hundreds of feet away from any infected individual. Thus, someone not even in the vicinity of an infected person can unknowingly touch an infected surface, later touch their face, and become infected.

11.     In an effort to combat the virus and slow the spread of COVID-19, state and local governments across the country have imposed directives requiring residents to remain in their homes except to perform certain "essential" activities, like shopping for food, going to see a doctor, or getting fresh air.  According to the New York Times, 95% of the United States population currently is under one or more state or local directives to stay at home.

12.     The state and local directives typically require businesses deemed "non-essential" to be closed and in-person work is not permitted. But even businesses classified as "essential" have

been severely impacted by the pandemic. For example, "essential" businesses have had to increase the frequency of cleaning, reduce hours, and install new protective barriers between employee and customer, limit the number of customers allowed on the premises and provide personal protective equipment to its workforce. But even with those precautions, many such business have had great difficulty retaining employees who fear becoming infected at work.

13.      Plaintiff is based in Johnson County, Kansas, and its physicians practice medicine at several hospitals in Johnson County, Kansas, including, Advent Health – Shawnee Mission, Advent Health – Overland Park, Advent Health – Prairie Star, and Kansas City Orthopedic Institute.

14.      Plaintiff's physicians also practice medicine at several hospitals in Kansas City, Missouri, Jackson County, Missouri, and Clay County, Missouri, including Saint Joseph Medical Center, St. Mary's Medical Center, and Liberty Hospital.

15.      Johnson County and the State of Kansas have issued stay-at-home orders, as have the neighboring City of Kansas City, Missouri, Jackson County, Missouri, Clay County, Missouri and the State of Missouri (hereafter, "Stay at Home Orders"). These Stay at Home Orders remain in effect and have caused the suspension of non-essential and essential businesses.

16.      Each of the hospitals at which Plaintiff's physicians work, following local, state and federal recommendations, issued decrees or orders suspending all elective medical procedures. These decrees and orders were done to prevent the spread of COVID-19 and protect the insured property from further damage caused by COVID-19.

17.      The Stay-at-Home Orders, government recommendations/directives on the suspension of all elective medical procedures and the transmission of COVID-19 have had a devastating effect on Plaintiff's business. The cancellation of elective procedures was done in an

effort to preserve valuable Personal Protective Equipment (PPE), make sure respirators remain available, free hospital staff and resources for the treatment of COVID-19 patients, and to reduce unnecessary exposure to the virus for both patients and medical professionals. As of the date of this filing Plaintiff has lost approximately $1.1 million dollars in expected revenue.

18.     The hospitals in which Plaintiff's physicians practice medicine have been infected with COVID-19.  As such, there has been direct physical damage and loss to properties covered by the Defendant's policy.  Although ingress and egress to properties covered by Defendant's policy is currently limited due to Stay at Home Orders and transmission concerns, according to the World Health Organization ("WHO"), the incubation period for the coronavirus is at least 14 days. Current evidence shows the first death from COVID-19 was at least February 6, 2020—weeks earlier than previously reported, suggesting that the virus has been circulated in the United States much earlier than previously assumed.  Patients, employees, and/or other visitors to the insured property over the last two months were infected with the coronavirus and thereby infected the insured property with the coronavirus.

19.     The transmission of COVID-19, Stay at Home Orders, and local, state and federal recommendations/directives have damaged Plaintiff's or other Class members' businesses. For example, patients cannot access radiological services provided at area hospitals and other imaging centers except on an emergent basis due to Stay at Home Orders, local, state and federal recommendations/directives or the risk of being infected with or spreading COVID-19.

20.     Plaintiff, like countless other small businesses, prepared for an unexpected event like the COVID-19 pandemic. Specifically, it purchased all-risk commercial property insurance from Defendant, bearing Policy No. 4030660827 (the "Policy"), that did not exclude pandemic coverage. A true and accurate copy of the Policy is attached hereto as Exhibit A.

21.     The Policy is composed of a number of forms and endorsements that define the scope of coverage. Upon information and belief, the forms and endorsements used in Plaintiff's Policy are materially the same as those policies held by the members of the proposed class.

22.     The Policy is an all-risk policy, meaning it covers all losses for direct "loss" to Covered Property unless specifically excluded. Exhibit A at 20. "Loss" is undefined by the Policy.

23.     As set forth below, the Policy also provides coverage for:

   a.     losses sustained due to the necessary suspension of operations ("Business Income" coverage) (*id.* at 42-43);

   b.     interruption of business caused by an order from a civil authority ("Civil Authority" coverage) (*id.* at 68);

   c.     expenses incurred to minimize suspension of business ("Extra Expense" coverage) (*id.* at 42-43); and

   d.     expenses necessary to protect Covered Property from further damage in the event of a loss ("Sue and Labor" coverage) (*id.* at 28).

24.     The Policy defines "suspension" as "[t]he partial or complete cessation of your business activities" or "[t]hat a part or all of the described premises is rendered untenantable." Exhibit A at 39.

25.     In addition, the Policy requires the Plaintiff to "[t]ake all reasonable steps to protect the Covered Property from further damage" when a loss occurs, which in this instance required Plaintiff to suspend or limit operations to only non-elective or acute medical care and treatment in an attempt to reduce the spread of COVID-19 and further losses occasioned by its spread. Exhibit A at 28.

26.     On or about April 27, 2020, Plaintiff notified Defendant of a loss covered by the Policy, seeking coverage related to COVID-19. In response, on April 28, 2020, a representative of Defendant's parent company, CNA Financial Corporation ("CNA"), contacted Plaintiff's representatives seeking additional information, which was provided on the same date it was

requested. Since that date, neither Defendant nor the claims specialist from CAN, has sought or requested any additional information or had any substantive communications with Plaintiff or its representatives about the claim. Despite Plaintiff making a request for coverage 18 days ago, Defendant has not agreed to cover any of Plaintiff's losses or damages. In fact, Defendant has refused to issue a decision on Plaintiff's claim despite having sufficient information to evaluate the claim. Accordingly, plaintiff seeks a declaration that Defendant is obligated to provide coverage and pay losses to Plaintiff for damages related to COVID-19.

27.     Upon information and belief, Defendant and/or CNA, made a corporate decision to deny claims related to COVID-19 under  Defendant's standard policy. Indeed, during a March 4, 2020 conference call hosted by CNA's highest-ranking executives to discuss first quarter earnings with industry and financial analysts, Dino E. Robuston, CNA's Chairman and CEO stated:

> Before we move to the question-and-answer portion of the call, let me provide some perspective on the pandemic and our portfolio. The claim notices we have received to date are mainly business interruption notices related to our property forms.
>
> So, let me start here. Our property policies require direct physical damage to the property from a covered peril for coverage to attach. And on property policies. whether issued in the US or international, all have exclusions barring coverage for viruses. There are a very few policies where coverage may exist on small participation in our Lloyd's operation, but the total limit exposed is de minimis. So, with respect to business interruption, our property policy exclusionary language does not provide coverage for COVID-19, and as such we never collect a premium for it.

28.     Upon information and belief, and consistent with the corporate decision described above Defendant has uniformly refused to pay its insureds under its standard policy for losses related to COVID-19.

29.     Defendant has caused material harm to Plaintiff and the proposed class by refusing coverage under the Policy.

30.     On behalf of itself and the class, Plaintiff seeks to recover declaratory and injunctive relief.

## PARTIES

31.     Plaintiff Alliance Radiology, P.A. is a Kansas professional association, with its principal place of business in Overland Park, Kansas.

32.     Defendant Continental Casualty Company is an Illinois corporation, with its principal place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

33.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed class contains more than 100 members.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3.2(b)(3) because a substantial portion of the events giving rise to Plaintiff's causes of action occurred in this judicial district and division. The Policy at issue covers Plaintiff's premises and business operations located in the State of Kansas, and Plaintiff purchased the Policy from an insurance broker whose primary office is located in Johnson County, Kansas.

## FACTUAL BACKGROUND

35.     COVID-19, the Stay at Home Orders, and local, state and federal recommendations/directives have forced Plaintiff to reduce and suspend its operations.  Its administrative office is located in Overland Park, Kansas. Plaintiff's physicians practice medicine in hospitals in Johnson County, Kansas, Jackson County, Missouri, Clay County, Missouri and other area counties.

36.     Effective at 12:01 a.m. on March 24, 2020, Johnson County, Kansas issued a stay-home Order to mitigate the spread of COVID-19 in Johnson County, Kansas on the basis of a confirmed outbreak and person-to-person spread of COVID-19 in the United States, Kansas and Johnson County.[1]   The Johnson County Order specifically recognized that COVID-19 spreads easily from person to person and may result in serious illness or death. It further identified COVID-19 as a public disaster affecting life, health, property, and the public peace. The Johnson County Order was issued to mitigate and slow the spread of COVID-19 in the community.

37.     Effective at 12:01 a.m. on March 28, 2020, the Kansas Governor issued an executive order establishing a statewide "stay-home" order in conjunction with the Kansas Essential Function Framework for COVID-19 response efforts, superseding the Johnson County Order. The Kansas Order directed all Kansas to stay in their homes to slow the spread of COVID-19.[2]   The purpose of the Kansas Order is to "mitigate the spread of COVID-19 throughout Kansas" as it recognized the confirmed presence of positive cases among 31 counties.[3]   On April 16, 2020, the Kansas Order was extended to May 3, 2020 and remains in effect.[4]

38.     On March 22, 2020, the City of Kanas City, Missouri issued stay-at-home order prohibiting individuals from leaving their residences except to perform "Essential Activities," as defined in the order. The order also required all "non-essential" businesses to cease in-person operations. As defined in the order, "Essential Businesses," include things like healthcare

---

[1]     https://www.jocogov.org/sites/default/files/documents/CMO/JoCo%20Public%20Health%2
0Officer%20Stay%20at%20Home%20Order%203-22-20.pdf

[2]     https://www.coronavirus.kdheks.gov/DocumentCenter/View/873/Essential-Activities-and-Essential-Functions-PDF---4-15-20

[3]     https://governor.kansas.gov/wp-content/uploads/2020/03/EO20-16.pdf

[4]     https://www.coronavirus.kdheks.gov/DocumentCenter/View/132/Executive-Order-20-24-Statewide-Stay-Home-Order-PDF---4-16-20

operations, essential infrastructure, and grocery stores. On April 16, 2020, Kansas City extended the Order through May 15.

39.     On March 22, 2020, Clay County, Missouri issued a stay-at-home order prohibiting individuals from leaving their residences except to perform "Essential Activities," as defined in the order. The order also required all "non-essential" businesses to cease in-person operations. As defined in the order, "Essential Businesses," include things like healthcare operations, essential infrastructure, and grocery stores.[5] On April 22, 2020, Clay County extended the Order through May 3, 2020.[6]

40.     On April 24, 2020, Jackson County, Missouri issued a stay-at-home order similarly requiring individuals in the county to avoid leaving their homes except as necessary.

41.     On April 3, 2020, the State of Missouri issued a stay-at-home order similarly requiring individuals residing in Missouri to avoid leaving their homes, including to go to work, except as necessary to perform limited activities. On April 16, 2020, Missouri extended its order through May 3, 2020.  Collectively, these are referred to as "Stay at Home Orders" or "Orders."

42.     As of April 17, 2020, at least 42 states and countless local governments have issued substantially similar directives. The purpose of these orders is to mitigate and slow the spread of COVID-19.

43.     Although the Orders generally permit individuals to seek medical care, most area hospitals and medical practices have suspended all elective or non-emergency medical care in response to the Stay at Home Orders and local , state, and federal recommendations/directives in

---

[5]https://www.clayhealth.com/DocumentCenter/View/1009/Clay-County-Public-Health-Emergency-Order---Updated-32220
[6]https://www.clayhealth.com/DocumentCenter/View/1043/Clay-County-Public-Health-Emergency-Order-03222020---Amendment-2

an effort to conserve valuable medical resources, including staffing and supplies, and to reduce patients' and medical professionals' exposure to the virus.

44.     The Centers for Medicare and Medicaid Services ("CMS"), the federal agency within the U.S. Department of Health and Human Services responsible for the administration of Medicare and coordination with States on the administration of Medicaid,  issued the following guidance to hospitals and surgery centers in evaluating whether to proceed with elective medical procedures:

> a.  The current and projected COVID-19 cases in the facility and geographic region;
>
> b.  PPE supply at the facility and other area facilities;
>
> c.  Medical staff availability;
>
> d.  Bed availability, with critical emphasis on intensive care unit (ICU) beds;
>
> e.  Ventilator availability;
>
> f.  Testing capability in the local community;
>
> g.  Ability to utilize telehealth, virtual check-ins, and/or remote monitoring;
>
> h.  The patient's health, age, and any underlying risk factors; and
>
> i.  Urgency of the treatment or service.

45.     The American College of Radiology published a blog article describing the impact of COVID-19 on radiology departments and practices across the country as follows: "The postponement and cancellation of elective imaging and procedures has significantly affected radiology department finances. Department leadership has been pushed to find ways to cut costs in the short term for practices to remain solvent."

46.     According to the Center for Disease Control ("CDC"), everyone is at risk of getting COVID-19.  The virus can spread by respiratory droplets when an infected person coughs, sneezes, or talks.  A person can become infected from respiratory droplets or potentially by touching a surface or object that has the virus on it and then by touching the mouth, nose, or eyes.[7]  According to studies, the virus can live on surfaces for several days if not longer.[8]

47.     In addition, some scientific publications have reported finding COVID-19 in the air.  The New England Journal of Medicine reported finding that experimentally produced aerosols containing the virus remained infectious in tissue-culture assays, with only a slight reduction in infectivity during a 3-hour period of observations.  "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces…."[9]

48.     A consensus appears to be emerging that COVID-19 can also travel through the air via aerosols. For example, aerosol scientist Lidia Morawska of the Queensland University of Technology in Brisbane, Australia told *Nature* that, "In the minds of scientists working on this, there's absolutely no doubt that the virus spreads in the air. This is a no-brainer."[10]

49.     An April 2020 study published in the journal *Emerging Infectious Diseases* found a wide distribution of COVID-19 on surfaces and in the air about *13 feet* from patients in two hospital wards in Wuhan, China, leading the authors to conclude that the virus spreads in aerosols in addition to large respiratory droplets. The investigators found evidence of the virus in swabs of floors, computer mice, trash bins, bed handrails, patients' face makes, health workers' personal protective equipment, and air vents.[11]

---

[7] https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf

[8] https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf

[9] https://www.nejm.org/doi/full/10.1056/NEJMc2009324

[10] https://www.nature.com/articles/d41586-020-00974-w

[11] https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

50.    The authors also surmised that the high rate of positivity for floor samples in the hospital strongly suggest that droplets fall to the ground and then are spread via patients' shoes. For example, every sample tested from the pharmacy floor tested positive for COVID-19 even though no patients were housed there.[12]

51.    Another study conducted in Wuhan indicates that staff movement, floor cleaning, and the removal of personal protective equipment could transmit the virus through the re-suspension of virus-contaminated aerosols.[13]

52.    Kimberly Prather, an aerosol chemist at the University of California, San Diego told *Science* magazine: "I'm relieved to see aerosolization is accepted. This added airborne pathway helps explain why it is spreading so fast."[14]

53.    Aerosol particles are held in the air by physical and chemical forces. The suspended particles remain for *hours or more*, depending on factors such as heat and humidity. If virus particles can be suspended in air for more than a few seconds, like, for instance, the measles virus can, then anyone passing through could become infected by a pathogenic aerosol cloud. And the virus can travel long distances and land on surfaces, only to be stirred back up into the air later by cleaning or other disturbances.

54.    The SARS virus that caused a 2003 epidemic is a coronavirus and is similar to COVID-19 (technically named SARS-CoV-2). As a result, the behavior of SARS during the 2003 epidemic provided evidence about any aerosol risk from COVID-19.

55.    A 2014 analysis published in the journal *Clinical Infectious Diseases* investigated a seemingly puzzling outbreak in a Hong Kong apartment complex whose residents had not been

---

[12] https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces
[13] https://www.biorxiv.org/content/10.1101/2020.03.08.982637v1
[14] https://www.sciencemag.org/news/2020/04/you-may-be-able-spread-coronavirus-just-breathing-new-report-finds#

in close contact with each other.[15] The study found that "airborne spread was the most likely explanation, and the SARS coronavirus could have spread over a distance of 200 meters," or about 600 feet.[16]

56.     The implications of airborne spread of the virus are extremely serious. Airborne spread means that the virus can travel long distances from any infected person. It can then infect someone who unknowingly walks through a pathogenic cloud. It can also infect someone by settling on a physical surface, which someone touches and later becomes infected. And regardless of the transmission method, the evidence suggests that COVID-19 can be transmitted by shoes even once it reaches the ground.

57.     State and local governments have determined that without the Stay at Home Orders, COVID-19 could spread rampant throughout the community.

58.     The Orders in and around Plaintiff's place of business also explicitly acknowledge that COVID-19 causes direct physical damage and loss to property:

  a.   the Johnson County, Kansas order states that COVID-19 "endanger[s] health, safety and welfare of persons and **property** within the border of Johnson County, Kansas" and that it "remains a public disaster affecting life, healthy, **property**, and the public space.[17]  (emphasis added);

  b.   the City of Kansas City, Missouri, issued Order 20-01 in response to the pandemic, which states that "the City wishes to employ all means available

---

[15] https://academic.oup.com/cid/article/58/5/683/365793

[16] *Id.*

[17] https://www.jocogov.org/sites/default/files/documents/CMO/JoCo%20Public%20 Health%20Officer%20Stay%20at%20Home%20Order%203-22-20.pdf

under the law to protect public life, health, safety and **property** to limit the development, contraction and spread of COVID-19"[18] (emphasis added).

    c.  the Clay County, Missouri order issued on March 22, 2020 declared a public health emergency and provided that "the County wishes to employ all means available under the law to protect public life, health, safety and **property** to limit the development, contraction and spread of COVID-19 creating this emergency"[19] (emphasis added).

59.      In order to protect itself against risks like COVID-19, Plaintiff purchased the Policy from Defendant. The Policy was in effect at the time of the outbreak and remains in effect today. Plaintiff paid all premiums required by the Policy.

60.      Plaintiff is the Named Insured under the Policy, which remains in force.

61.      Defendant is the effective and liable insurer of the Policy, and policies meeting the class definition.

62.      Generally, under property insurance policies like those issued by Defendant to Plaintiff and class members, the insuring agreements provide coverage for all risks of physical loss or damage to property, unless specifically excluded.

63.      The Policy is an "all-risk" policy. It covers "direct 'loss' unless the 'loss' is excluded or limited" by the Policy.

64.      The Policy does not exclude or limit coverage for losses from viruses or communicable diseases like COVID-19. Nor does it contain a pandemic-exclusion clause.

---

[18]http://mediaassets.kshb.com/NWT/Sam/Mayor%20Lucas%20Stay%20at%20Home%20
Order.pdf?_ga=2.87564241.83785035.1587504680-1549958454.1581544124

[19]https://www.clayhealth.com/DocumentCenter/View/1009/Clay-County-Public-Health-Emergency-Order---
Updated-32220

65.     The risk of a virus like COVID-19 was foreseeable to, if not foreseen by, insurance companies like the Defendant.   The Insurance Services Office ("ISO"), an organization that provides policy writing services to insurers, has recognized for years that a virus can constitute physical damage to property. Specifically, in 2006, it announced the submission of an exclusion of loss "due to disease-causing agents such as viruses and bacteria."

66.     In connection with circulating the virus exclusion, ISO sent the following statement to state insurance regulators:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

67.     Despite the availability of a specific exclusion for viruses, Plaintiff's Policy contains no such exclusion.  Nor does Plaintiff's Policy contain an exclusion for "pandemics," "communicable disease" or anything similar.

68.     Because damage due to viruses constitute physical damage and loss under the Policy, the Stay at Home Orders and local, state and federal recommendations/directives  have caused Plaintiff to limit or suspend many of its business operations, Plaintiff's losses are covered under the Policy. Moreover, to mitigate further losses, as required by the Policy, Plaintiff reduced operations when officials announced that COVID-19 posed a risk of causing further physical damage and loss.

69.     The Policy provides coverage for several different types of losses arising from COVID-19 that are relevant here through specific Coverage Extensions:

70.     Defendant is obligated to pay for actual loss of **"Business Income"** sustained due to the necessary suspension of operations caused by direct physical loss or damage. Exhibit A at 42. "Business Income" means net income (net profit or loss before income taxes) that would have been earned or incurred in the absence of "loss" as well as continuing normal operating expenses, including payroll. *Id.* at 42. Coverage lasts during the "period of restoration" – beginning at the time of the direct loss and running through the earlier of the date the property is repaired or resumed at a new permanent location. *Id.* at 37, 42.  A "partial or complete cessation" of business activities constitutes a "suspension" under the Policy. *Id.* At 39.  Plaintiff has suffered lost Business Income because it has suspended operations of its business due to COVID-19.

71.     Defendant also agreed to provide coverage from an interruption to business caused by an order from a **"Civil Authority."** Exhibit A at 75. Specifically, Defendant agreed to "pay for the actual loss of 'Business Income'" that Plaintiff sustained and "necessary Extra Expense" caused by action of civil authority that prohibits access to" the Covered Property when, due to physical damage to property near the Covered Property, the civil authority prohibits access to property immediately surrounding the damaged property, the Covered Property is within the prohibited area, and the civil authority action is taken "in response to dangerous physical conditions." *Id.* Access has been restricted to the Covered Property due to the presence and threat of COVID-19 in the immediate surrounding areas and related Stay-at-Home Orders.

72.     Defendant also agreed to pay for **"Extra Expense."** Exhibit A at 43. Extra Expenses are expenses to avoid or minimize suspension of business whether or not operations are able to continue and to repair or replace property. *Id.*  Plaintiff has suffered Extra Expenses because it has suspended operations due to COVID-19 to prevent physical damages to the premises by the presence or proliferation of the virus and the physical harm it could cause persons present there.

73.     Finally, the Policy also provides **"Sue and Labor"** coverage, which requires the insured to "[t]ake all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim" in the event of a loss or damage. Exhibit A at 28. Plaintiff has taken such steps by, for example, complying with the Stay-at-Home Orders.

74.     Losses caused by COVID-19 and the related state and local Stay at Home Orders triggered these provisions of Defendant's Policy. Specifically, Plaintiff's operations have been reduced, and in some instances suspended, and it has lost revenue and business opportunities because it has been unable to provide elective radiological services.

75.     Plaintiff submitted a claim to Defendant for coverage under the Policy. . To date, some 18 days later, Defendant has not agreed to pay the claim despite Plaintiff supplying requested information to Defendant, or its representative CNA, no later than April 28, 2020.

### CLASS ACTION ALLEGATIONS

76.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4), Plaintiff brings this action on behalf of himself and all others similarly situated, and seeks to represent the following nationwide classes:

a.     **Nationwide Declaratory Judgment and Injunctive Class.** All businesses subject to a Stay at Home Order that are covered by one of the Defendant's policies which contains **Business Income, Extra Expense, Civil Authority,** and/or **Sue and Labor** coverage on terms similar to the Plaintiff's policy ("Policies") which were in effect during the COVID-19 pandemic.

      b.  **Nationwide Breach Class.**  All policyholders of Defendants who made a claim and were denied coverage under one of Defendants' Policies due to COVID-19.

**Kansas Subclass.** All policyholders who purchased one of Defendants' Policies in Kansas which contain **Business Income, Extra Expense, Civil Authority,** and/or **Sue and Labor** coverage on terms similar to the Plaintiff's policy ("Policies") which were in effect during the COVID-19 pandemic. Excluded from the Class is the Defendant, any entity in which the Defendant has a controlling interest, any of the officers, directors, or employees of the Defendant, the legal representatives, heirs, successors, and assigns of the Defendant, anyone employed with Plaintiff's counsel's firms, and any Judge to whom this case is assigned, and his or his immediate family.

77.    Plaintiff's Classes satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23, as set forth more fully herein.

78.    **Numerosity**. COVID-19 has impacted thousands of businesses across the country and Defendant is a nationwide insurer with, on information and belief, hundreds or more policies issued with the relevant provisions.  Consequently, the Classes each number in at least the hundreds and most likely thousands, and thus the numerosity standard is satisfied.  Moreover, because the members of the Classes are geographically dispersed across the country, and members of the Kansas Subclass are geographically dispersed across the state, if not elsewhere, joinder of all Class members in a single action is impracticable. Class members and Kansas Subclass members may be informed of the pendency of this class action through direct mail or other means based on Defendant's records of its policyholders.

79.     **Commonality**. There are questions of fact and law common to the Classes that predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from Defendant's actions include, without limitation, the following:

    a.   Do the Policies cover losses resulting from the COVID-19 pandemic?

    b.   Do the policies cover losses resulting from state and local Stay At Home Orders requiring the suspension or reduction of business?

    c.   Has Defendant wrongfully failed to pay or denied claims for business losses resulting from COVID-19 and/or the Stay at Home Orders?

    d.   Does the **Business Income** coverage of the Policies cover losses caused by suspension or reduction of business due to COVID-19 and/or the Stay-at-Home Orders?

    e.   Does the **Civil Authority** coverage of the Policies cover losses caused by suspension or reduction of business due to Stay-at-Home Orders issued by state and local governments?

    f.   Does the **Extra Expense** coverage of the Policies cover losses incurred to minimize the harm to Plaintiff and members of the Class' covered premises because of COVID-19 and/or the Stay-at-Home Orders?

    g.   Does the **Sue and Labor** coverage of the Policies cover losses caused by suspension or reduction of business due to COVID-19 and/or the Stay-at-Home Orders?

    h.   Are Class members entitled to reasonable attorneys' fees and expenses?

80.     **Predominance.** The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein.   Specifically, thousands of business are impacted by Defendant's refusal to pay or denial of coverage for COVID-19 losses and their claims arise from a common factual predicate, which is the nationwide shutdown, suspension or reduction of activities due to the virus and/or Stay at Home Orders.

81. **Typicality.** Plaintiff's claims are typical of those of the Class as Plaintiff was subject to the same or similar policy provisions and the losses for all members relate to COVID-19 and the related closure orders and the claims arise from the same legal theories.

82. **Superiority**. A class action is the appropriate method for the fair and efficient adjudication of this controversy. Defendant has acted or refused to act on grounds generally applicable to the Class and Kansas Subclass. The presentation of separate actions by individual Class members and Kansas Subclass members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Class members to protect their interests.

83. **Adequacy**. Plaintiff is an adequate representative of the Class and Kansas Subclass because it is a member of the Class and its interests do not conflict with the interests of those it seeks to represent.  The interests of the Class members will be fairly and adequately protected by Plaintiff and its counsel, who have extensive experience prosecuting complex class litigation.

84. **Declaratory Relief and certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure**. On information and belief, Defendant has refused, or intends to refuse, coverage due to COVID-19 business interruption and other covered losses for all, or most, policyholders with covered Policies and final injunctive and/or declaratory relief mandating that Defendant cover the losses of Class members is appropriate respecting the class as a whole.

85. **Issue Class and Modification of Class Definitions and Creation of Subclasses**. In the alternative, Plaintiff reserves the right to seek certification of one or more common issues pursuant to Rule 23(c)(4). In addition, Plaintiff reserves the right to modify the definitions of the class and/or create subclasses either by amendment to the complaint or by motion for class certification, including but not limited to subclasses for policyholders with each of the following

Policy provisions: **Business Income, Extra Expense, Civil Authority,** and/or **Sue and Labor** and/or other subclasses as may be appropriate or necessary.

## COUNT I: DECLARATORY AND INJUNCTIVE RELIEF – BUSINESS INCOME
### (On behalf of Nationwide Declaratory Judgment and
### Injunctive Class and Kansas Subclass)

86.     The preceding paragraphs are incorporated by reference as if fully alleged herein.

87.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

88.     An actual controversy has arisen and now exists between Plaintiff and the class, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. On April 27, 2020, Plaintiff requested coverage for COVID-19 related losses and subsequently provided Defendant with all requested information regarding the losses. Defendant is in breach of its obligations by not providing coverage despite having sufficient information to evaluate the claim. Moreover, Defendant has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy for, among other reasons, that there is no physical damage to the covered property.

89.     Plaintiff contends that Defendant has breached the Policies in the following respects:

        a.     Plaintiff and the class have suffered losses covered by the Business Income Coverage in the Policies.

        b.     Defendant is obligated to pay Plaintiff and the class for those losses.

        c.     Defendant has failed to pay Plaintiff and the class for those losses.

90.     Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the aforementioned conduct of Defendant unlawful and in material breach of the policies so that future controversies may be avoided.

91.     Pursuant to a declaration of the parties' respective rights and duties under the policies, Plaintiff further seeks an injunction enjoining Defendant (1) from continuing to engage in conduct in breach of the Policies in regard to coverage decisions under the Business Income Coverage Extension; and (2) ordering Defendant to comply with the terms of the Policies in regard to coverage decisions.

## COUNT II: DECLARATORY AND INJUNCTIVE RELIEF – CIVIL AUTHORITY
### (On behalf of Nationwide Declaratory Judgment and Injunctive Class and Kansas Subclass)

92.     The preceding paragraphs are incorporated by reference as if fully alleged herein.

93.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

94.     An actual controversy has arisen and now exists between Plaintiff and the class, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies.

95.     Plaintiff contends that Defendant has breached the Policies in the following respects:

    a.     Plaintiff and the class have suffered losses covered by the Civil Authority Coverage in the Policies.

    b.     Defendant is obligated to pay Plaintiff and the class for those losses.

    c.     Defendant has failed to pay Plaintiff and the class for those losses.

96.     Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the aforementioned conduct of Defendant unlawful and in material breach of the policies so that future controversies may be avoided.

97.     Pursuant to a declaration of the parties' respective rights and duties under the policies, Plaintiff further seeks an injunction enjoining Defendant (1) from continuing to engage in conduct in breach of the Policies in regard to coverage decisions under the Civil Authority Coverage in the Policies; and (2) ordering Defendant to comply with the terms of the Policies in regard to coverage decisions.

**COUNT III: DECLARATORY AND INJUNCTIVE RELIEF – EXTRA EXPENSE**
**(On behalf of Nationwide Declaratory Judgment and**
**Injunctive Class and Kansas Subclass)**

98.     The preceding paragraphs are incorporated by reference as if fully alleged herein.

99.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

100.    An actual controversy has arisen and now exists between Plaintiff and the class, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies.

101.    Plaintiff contends that Defendant has breached the Policies in the following respects:

a.      Plaintiff and the class have suffered losses covered by the Extra Expense Coverage in the Policies.

b.      Defendant is obligated to pay Plaintiff and the class for those losses.

c.      Defendant has failed to pay Plaintiff and the class for those losses.

102.     Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the aforementioned conduct of Defendant unlawful and in material breach of the policies so that future controversies may be avoided.

103.     Pursuant to a declaration of the parties' respective rights and duties under the policies, Plaintiff further seeks an injunction enjoining Defendant (1) from continuing to engage in conduct in breach of the Policies in regard to coverage decisions under the Extra Expense Coverage in the Policies; and (2) ordering Defendant to comply with the terms of the Policies in regard to coverage decisions.

## COUNT IV: DECLARATORY AND INJUNCTIVE RELIEF – SUE AND LABOR
### (On behalf of Nationwide Declaratory Judgment and Injunctive Class and Kansas Subclass)

104.     The preceding paragraphs are incorporated by reference as if fully alleged herein.

105.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

106.     An actual controversy has arisen and now exists between Plaintiff and the class, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies.

107.     Plaintiff contends that Defendant has breached the Policies in the following respects:

a.       Plaintiff and the class have suffered losses covered by the Sue and Labor provision in the Policies

b.       Defendant is obligated to pay Plaintiff and the class for those losses.

c.       Defendant has failed to pay Plaintiff and the class for those losses.

108.    Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the aforementioned conduct of Defendant unlawful and in material breach of the policies so that future controversies may be avoided.

109.    Pursuant to a declaration of the parties' respective rights and duties under the policies, Plaintiff further seeks an injunction enjoining Defendant (1) from continuing to engage in conduct in breach of the Policies in regard to coverage decisions under the Sue and Labor provision; and (2) ordering Defendant to comply with the terms of the Policies in regard to coverage decisions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests relief and judgment against Defendant as follows:

a.    That the Court enter an order certifying the class, appointing Plaintiff as a representative of the class, appointing Plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

b.    For a judgment against Defendant for the causes of action alleged against it;

c.    For a declaration that Defendant's conduct as alleged herein is unlawful and in material breach of the Policy;

d.    For appropriate injunctive relief, enjoining Defendant from continuing to engage in conduct related to the breach of the Policy;

e.

f.    For Plaintiff's attorney's fees;

g.    For Plaintiff's costs incurred; and

h.   For such other relief in law or equity as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.


Date: May 15, 2020                    Respectfully submitted,

                                      **STUEVE SIEGEL HANSON LLP**

                                      *s/ Patrick J. Stueve*
                                      Patrick J. Stueve KS Bar #13847
                                      Bradley T. Wilder D. Kan #78301
                                      Curtis Shank KS Bar #26306
                                      460 Nichols Road, Suite 200
                                      Kansas City, Missouri 64112
                                      Telephone:    816-714-7100
                                      Facsimile:    816-714-7101
                                      Email:        stueve@stuevesiegel.com
                                      Email:        wilders@stuevesiegel.com
                                      Email:        shank@stuevesiegel.com

**LANGDON & EMISON**

J. Kent Emison     D.Kan.    #78360
LANGDON & EMISON LLC
911 Main Street
PO Box 220
Lexington, Missouri 64067
Phone: (660) 259-6175
Fax: (660) 259-4571
kent@lelaw.com

**MILLER SCHIRGER LLC**

John J. Schirger         D. Kan. #78228
Matthew W. Lytle        D. Kan. #78109
Joseph M. Feierabend   D. Kan. #78350
MILLER SCHIRGER, LLC
4520 Main Street, Suite 1570
Kansas City, MO 64111
Telephone: (816) 561-6500
Facsimile:   (816) 561-6501
jschirger@millerschirger.com
mlytle@millerschirger.com
jfeierabend@millerschirger.com

**SHAFFER LOMBARDO SHURIN, P.C.**

*/s/ Richard F. Lombardo*
Richard F. Lombardo  KS# 22326
James D. Myers  KS# 18709
Dawn M. Parsons  KS# 16346
Michael F. Barzee  KS# 27217
Rachael D. Longhofer  KS# 25451
2001 Wyandotte Street
Kansas City, MO 64108
816-931-0500
816-931-5775 (Fax)
rlombardo@sls-law.com
jmyers@sls-law.com
dparsons@sls-law.com
mbarzee@sls-law.com
rlonghofer@sls-law.com
*Attorneys for Plaintiff and the Proposed Classes*